IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Ricky New, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br><br>Defendant. ) | Civil Action No. 6:14-291-BHH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

In July 2010, the plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, alleging that he became unable to work on February 14, 2008. The applications were denied initially and on reconsideration by the Social Security Administration. On May 24, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Karl S. Weldon, an impartial vocational expert, appeared on May 9, 2012, considered the case *de novo*, and

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

on July 11, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on December 4, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.
>
> (2)    The claimant has not engaged in substantial gainful activity since February 14, 2008, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following combination of medically determinable severe impairments: thoracic degenerative joint disease with spondylosis, left ankle fracture status post open reduction and internal fixation with posttraumatic arthritis, and morbid obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except because of his need for a cane, he can do no lifting from a standing position. He can stand 45 minutes continuously. Because of pain medication, he is limited to unskilled work.
>
> (6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7)    The claimant was born on May 22, 1966, and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

2

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. §§ 404.1568 and 416.968).

(10)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)     The claimant has not been under a disability, as defined in the Social Security Act, from February 14, 2008, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that

3

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith*

*v. Schweiker*, 795 F.2d 343, 345 (4ᵗʰ Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4ᵗʰ Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972).

## EVIDENCE PRESENTED

### *Medical Evidence*

On February 14, 2008, the plaintiff sustained fractures to his left ankle and the right-side of his rib and lumbar spine and right hemothorax after a tree limb fell on him while he was cutting down trees (Tr. 237-38).  The plaintiff was hospitalized from February 14 to February 24, 2008 (Tr. 234-307).  Brad Freidinger, M.D., performed fixation and revision surgeries for the plaintiff's ankle fracture (Tr. 244-48).  X-rays of the plaintiff's thoracic and lumbar spine revealed no evidence of an unstable spine (Tr. 267, 269).  Upon his discharge, Brian Schmidt, M.D., advised the plaintiff to follow up with Dr. Freidinger and remain non-weight bearing with his left lower extremity while it healed (Tr. 237).

On May 6, 2008, the plaintiff sought emergency room treatment for a myofascial strain of his thoracic spine.  He complained of moderate to severe mid-back pain (Tr. 338-39, 351-52, 355-57, 462-63).

On August 25, 2008, the plaintiff began seeing Michael Tollison, M.D., of Piedmont Orthopaedic Associates, to explore treatment options for left ankle pain. Dr. Tollison diagnosed status-post left ankle fracture open reduction internal fixation ("ORIF") and ankle synovitis and post-traumatic changes. The plaintiff had an antalgic gait and used a cane. Dr. Tollison recommended that the plaintiff limit his standing, walking, and walking on un-level surfaces and ordered an MRI (Tr. 541-42).

On September 11, 2008, the plaintiff had an MRI of his left ankle that showed possible bone edema of the distal tibia and extensive post-surgical abnormalities, which limited visualization (Tr. 317).

On September 23, 2008, Joseph Jacko, M.D., of Steadman Hawkins Clinic, examined the plaintiff for workers' compensation purposes at the request of the plaintiff's attorney. The plaintiff advised Dr. Jacko that most of his treatment to-date was directed towards his ankle; therefore, his attorney wanted an evaluation for his complaint of pain that centered around the T7 area of his spine with some radiation in both the right and left sides. Dr. Jacko found the plaintiff to be overweight and deconditioned. The plaintiff's x-ray revealed rotation at T7 where he was most tender. The plaintiff had pain with AP and lateral chest compression, and he had some hypomobility at the T7 segment on range of motion testing. He had no joint swelling. Dr. Jacko diagnosed the plaintiff with spondylosis/degenerative joint disease of the thoracic spine and thoracic spine pain. Dr. Jacko sent the plaintiff for physical therapy and adjusted his medication (Tr. 308-310).

On October 14, 2008, Dr. Jacko reevaluated the plaintiff. The plaintiff reported feeling about the same as he had at his last visit, rating his pain at six to seven out of ten. Dr. Jacko indicated the plaintiff had not yet started physical therapy because they had not contacted him yet. The plaintiff reported that the combination of Mobic and Flexeril had not been working. On examination, the plaintiff had palpable tenderness in the mid thoracic area over the spinous processes and the interspaces in the right paraspinal area.

6

He had pain with AP and lateral chest compression, and he had limited range of motion on forward flexion with hypermobility into the thoracic spine. Dr. Jacko prescribed Ultram and indicated he would see what he could do to get physical therapy approved for the plaintiff (Tr. 311-12).

On November 4, 2008, Dr. Jacko reevaluated the plaintiff for continued mid back pain. The plaintiff continued to have back pain at 7 out of 10 and requested a stronger dose of Ultram rather than continuing to take Ultram and Darvocet. Dr. Jacko noted that physical therapy had finally been approved. The plaintiff was tender from T6 to T7 and had pain with AP and lateral chest compression. Dr. Jacko refilled his prescription for Darvocet and increased his dose of Ultram (Tr. 313-14).

On December 11, 2008, the plaintiff told Dr. Jacko that he felt better (Tr. 315). Dr. Jacko noted that the plaintiff had 12 therapy visits without much improvement. The plaintiff rated his pain at six and described it as feeling like someone was "stabbing" him. The plaintiff felt that his pain was still not adequately controlled, so Dr. Jacko adjusted his medication, prescribed a TENS unit, and injected his trigger points from T6 to T8 with a corticosteroid. Dr. Jacko continued physical therapy but stated that he was "not very optimistic that he will make great improvement" (Tr. 315-16).

By January 8, 2009, the plaintiff had begun seeing David L. Shallcross, M.D., of Upstate Medical Rehabilitation, chiefly complaining of back and ankle pain (Tr. 334). Dr. Shallcross reported that the MRI of the plaintiff's left ankle suggested possible edema of his distal tibia with extensive post-surgical abnormalities (Tr. 317, 334). Dr. Shallcross ordered an MRI of the plaintiff's thoracic spine, noting that the plaintiff's pain was severe and quite limiting (Tr. 334). The MRI revealed minimal degenerative changes of the mid and lower thoracic spine; the study was negative for a disc herniation or other significant finding (Tr. 333, 335).

7

On February 5, 2009, Dr. Shallcross reported that the plaintiff displayed good range of motion of his thoracic and lumbar spine with minimal tenderness. Dr. Shallcross advised that the plaintiff would always have difficulty working because of his difficulty ambulating; however, he had good potential for improvement and function of his back. Therefore, Dr. Shallcross recommended physical therapy and continued him on Lortab (Tr. 333).

On March 5, 2009, the plaintiff was evaluated by Dr. Shallcross. The plaintiff stated that he had started physical therapy and that it caused him a lot of pain. The plaintiff reported that his ankle was painful if he was up more than 20 minutes at a time and that he was having difficulty sleeping because of the pain. Dr. Shallcross reported that it was likely that the plaintiff would have difficulty returning to any sort of manual labor. Dr. Shallcross observed that the plaintiff's gait was "extremely" antalgic on the left and possibly a "little bit" exaggerated. However, there was no obvious swelling of his ankle or leg (Tr. 332).

On April 2, 2009, Dr. Shallcross evaluated the plaintiff, who reported that the TENS unit helped him a little bit. He indicated that his back pain was worse than the ankle pain. He estimated that he could stand for an hour or so at a time on most days but indicated that standing too long caused his ankle to swell. The plaintiff's gait was antalgic on the left, and he complained of tenderness in the T4 level on the left side. Dr. Shallcross indicated that the plaintiff's symptoms seemed "somewhat in excess of the problems seen on physical examination." Dr. Shallcross stated, "At this point, there are no further rehabilitation goals and he could be released at [maximum medical improvement ("MMI")] without a[] [functional capacity evaluation]" (Tr. 331).

On April 16, 2009, the plaintiff followed up with Dr. Tollison, whom he had not seen since August 2008 (Tr. 543-44). The plaintiff reported that workers' compensation had focused on treatment of his back before it authorized more treatment of his ankle (Tr. 543). The plaintiff reported that his pain was aggravated by standing/walking and "a lot" of activity

8

(Tr. 543). Dr. Tollison noted that the plaintiff's MRI revealed post-traumatic changes and that he did not think surgery would help. Dr. Tollison felt that the plaintiff was permanently restricted in his standing and walking (including limited walking on un-level surfaces). The plaintiff declined physical therapy. Dr. Tollison ordered an ankle brace and indicated he would evaluate the plaintiff after the brace trial (Tr. 543-44).

On April 30, 2009, Dr. Shallcross evaluated the plaintiff for continued back and ankle pain. Dr. Shallcross indicated that Dr. Tollison noted no further surgery could be done on the plaintiff's ankle and that he would continue to have some eversion. Dr. Shallcross opined that the plaintiff had "pretty much" no limitation in his sitting or using his hands while seated and could be on his feet in 45-minute intervals but could not carry anything when he used his cane for balance to avoid falls. The plaintiff had an antalgic gait, limited range of motion in his back, and tenderness in the mid thoracic region. Dr. Shallcross reiterated that the plaintiff had reached MMI, sustaining a 25% impairment to his left lower extremity and a 10% permanent impairment to his whole person. Dr. Shallcross indicated that the plaintiff had persistent pain in his rib cage and thoracic spine and continued to have difficulty getting a deep breath. Dr. Shallcross indicated that the plaintiff had persistent pain twisting his spine and had sustained a 15% spine impairment with a 15% impairment to his whole person as a result of his chest wall injury. Dr. Shallcross continued the plaintiff on Lortab 7.5 and indicated that he would continue to need bracing for his ankle in addition to pain medications and likely a muscle relaxer (Tr. 330).

On July 2, 2009, Dr. Tollison informed the plaintiff that he had reached MMI with respect to his left ankle (Tr. 545). The plaintiff's pain was improved (Tr. 545). Dr. Tollison told the plaintiff that he should replace his brace every one to two years and his accommodative shoes every six months (Tr. 545). Dr. Tollison continued to feel that the plaintiff was permanently restricted in his standing and walking (including limited walking on un-level surfaces) (Tr. 544). Dr. Tollison stated it was probable that the plaintiff would

9

need an ankle fusion with hardware removal in the future.  Dr. Tollison indicated that the plaintiff had a 15% impairment rating to his left lower extremity (Tr. 545-46).

On July 21, 2009, William Stewart, CRC, CVE, LCP, a board certified rehabilitation counselor and vocational evaluator, examined the plaintiff at the request of his attorney for workers' compensation purposes (Tr. 526-36).  The plaintiff reported that his daily activities included: straightening up his bedroom, washing/drying his clothes, helping cook/prepare meals, grocery shopping, cutting grass using a riding lawnmower, fishing in the local pond, listening to music, and watching television (Tr. 531).  On the Wide Range Achievement Test-Revised 4, the plaintiff read at the 6.9 grade level and did arithmetic at the 7.4 grade level.  His Beck Depression Inventory-II score suggested a minimal level of depression.  His Beck Anxiety Inventory score suggested a moderate level of anxiety.  The Life Situation Survey suggested an overall relatively poor quality of life (Tr. 532-33).  The results of the Penn Bi-Manual Dexterity Worksample suggested that he had a slow work speed and pace that contraindicated a job that involved fast paced/production rate work speed (Tr. 532).  On the Pain Activity Scales/Drawings, the plaintiff suggested that his symptoms/problems were worse in his mid-back and left lower leg, ankle and foot (Tr. 533).  Dr. Stewart indicated that the plaintiff had a flat affect and depressed mood.  He thought that the plaintiff exhibited a significant psychological overlay and he demonstrated concentration and attention span limitations (Tr. 531, 534).  The plaintiff appeared quite stressed due to chronic pain problems, inability to work, and inability to be more productive.  Dr. Stewart indicated that the plaintiff "appeared uncomfortable, shifting/adjusting his weight in the chair he was sitting in, changing positions from sitting to standing and moving about the room several times during the evaluation."  Dr. Stewart stated that the plaintiff appeared to be a motivated person who "would rather be working but was equally frustrated by his inability to do so."  Dr. Stewart felt that the plaintiff did not exaggerate or overstate his disabilities and that his description of his injury and ongoing problems was consistent with

10

his records.  Dr. Stewart believed that it was highly unlikely that the plaintiff would be able to find or sustain employment given his physical and psychological impairments/limitations and his age, educational abilities, and manual/physical work experience (Tr. 535).  Dr. Stewart also stated that the plaintiff was not a reasonable vocational rehabilitation candidate.  Dr. Stewart indicated that the plaintiff's chronic pain and resulting increased pain with activity and psychological symptoms prevented him from maintaining "adequate concentration, pace and persistence, meeting normal/expected levels of productivity/work output and maintaining a sufficient energy level which are all necessary to sustaining employment, particularly at sedentary to light levels of work."  Dr. Stewart also opined that it was unlikely that the plaintiff's vocational prognosis will change (Tr. 526-36).

On July 29, 2009, Robert Brabham, Ph.D., a licensed psychologist, of Psychological and Training Services, P.A., conducted a psychological and vocational evaluation of the plaintiff for workers' compensation purposes (Tr. 318-25).  The plaintiff's appearance was good.  Dr. Brabham noted that the plaintiff walked slowly with an obvious limp.  The plaintiff reported that he received income from workers' compensation payments and "side jobs" (Tr. 318-19).  He cared for his personal needs, did light chores around the house, and continued to drive (Tr. 319, 324).  The plaintiff denied any mental health issues or history of prior mental health services (Tr. 323).  He reported dealing with his wife's suicide after diagnosis of terminal cancer as well as could be expected.  He was oriented in all spheres and maintained good eye contact (Tr. 322).  On the Wechsler Adult Intelligence Scale-Third Ed., he obtained a full I.Q. score of 90 that placed him in the average range of functioning.  His general comprehension, abstract thinking, proverb interpretation, and general level of intellectual functioning was commensurate with his high school education.  On the Wide Range Achievement Test-Revision 3, he read at the sixth grade level.  Dr. Brabham reported that the plaintiff did not have a psychiatric diagnosis; he was diagnosed with a pain disorder.  Dr. Brabham reported that the plaintiff's positive

11

vocational factors included his age ("younger worker") and his high school education. Dr. Brabham opined that the plaintiff could not return to his past work because it involved strenuous activity and he relied on a cane for stability (Tr. 323). However, Dr. Brabham reported that the plaintiff's medical records revealed that he was unlimited in his ability to sit and use his hands; Dr. Brabham said that the plaintiff agreed with this assessment. Dr. Brabham concluded that the plaintiff could perform entry-level sedentary work and observed that most of these jobs actually permitted sit/stand options (Tr. 324). Dr. Brabham identified specific jobs that the plaintiff could perform within South Carolina (e.g., machine operator and tender and hand packer/packager) (Tr. 325).

On July 30, 2009, Dr. Shallcross evaluated the plaintiff for continued pain and concluded that his condition was stable (Tr. 329). The plaintiff reported that he continued to have quite a bit of back pain and although his ankle brace helped, it felt like it was putting pressure at the fracture fixation spot. He walked with his foot everted (Tr. 300). Dr. Shallcross recommended that the plaintiff wear a more fitted ankle brace (Tr. 329).

On November 12, 2009, Dr. Shallcross and Theresa Little, PA-C, his physician's assistant, evaluated the plaintiff for chronic pain. The plaintiff reported that his pain had level had been a bit better since he was taking it easier, but still got much worse with activity. The plaintiff also reported that his back pain was worse than his leg pain and that his pain caused sleep problems. The plaintiff indicated that Lortab had helped his pain, but only as long as he wasn't very active. Dr. Shallcross noted that the plaintiff had not been to work since his injury and had applied for disability. On examination, the plaintiff walked with a very antalgic gait but did well with transitional movements. His dose of Lortab was increased (Tr. 328).

On January 7, 2010, Dr. Shallcross reported that the plaintiff was doing about the same. The plaintiff reported that his back pain bothered him the most and that it flared up more easily than in the past. His medication was working. He exercised by walking "a

12

little bit," had not had any recent falls, and drove a car okay. He was continued on Lortab, Zestoretic, ibuprofen, and Zanaflex (Tr. 327).

On May 6, 2010, Dr. Shallcross reevaluated the plaintiff for continued leg and foot pain. Dr. Shallcross indicated that the plaintiff's gait remained extremely difficult and he continued to ambulate with his left foot everted. The plaintiff admitted that he had done a little bit of welding but indicated that he could not stay on his feet for very long. The plaintiff had considerable pain putting his left foot in a neutral position and had difficulty fully dorsiflexing his left ankle. Dr. Shallcross stated that the plaintiff was likely developing severe arthritic changes in the midfoot. Dr. Shallcross recommended x-rays or an MRI and indicated that the plaintiff would likely need a fusion or surgical debridement. Dr. Shallcross indicated that the plaintiff was without insurance. He increased the plaintiff's Lortab and recommended follow-up when he could afford it (Tr. 326).

On August 16, 2010, the plaintiff visited the emergency room complaining of chest tightness and shortness of breath and was admitted to the hospital with uncontrolled hypertension (Tr. 337, 340-50, 353-54, 358-461, 464-65). The plaintiff's musculoskeletal exam was negative other than some joint pain in his left ankle from his prior injury. There was no swelling of his lower extremities (Tr. 347-48).

On September 5, 2010, the plaintiff completed a Pain Questionnaire and Function Report-Adult (Tr. 171-81). The plaintiff lived alone (Tr. 175). He did light housekeeping (e.g., dusting, cooking, etc.) and ran errands (e.g., going to the grocery store) without assistance (Tr. 173, 176-77). He handled his own finances (Tr. 177-78). He went out three to five times a day. He traveled by walking or driving a car (Tr. 177). He contended that his midback and foot pain was worsened when he moved around "much," walked, and played with his granddaughter (Tr. 171). He did not need any special reminders or help to take care of his personal needs and grooming, or to take his medication (Tr. 176). His condition had not affected his memory, completing tasks,

concentration, attention, understanding, following instructions, and using hands (Tr. 179-80).  He handled stress and changes in routine okay (Tr. 180).

On November 29, 2010, Jeffrey Siegel, M.D., conducted a consultative examination of the plaintiff at the Commissioner's request (Tr. 466-69).  The plaintiff complained that his back hurt "all the time"; he used chronic pain medication, muscle relaxants, and a TENS unit.  Surgery was not recommended; his MRI revealed "minimal" degenerative changes in his mid to lower thoracic spine and was negative for herniation (Tr. 466).  He did not describe pain radiating up or down his back, around or through his chest, or into his legs or arms.  The plaintiff complained of left ankle pain, and he wore a hard brace on his left ankle.  The plaintiff also carried a cane, but Dr. Siegel observed that he did not need to use it for walking.  The plaintiff reported that he was independent in his activities of daily living (e.g., drove and did his own errands and grocery shopping for himself and his daughter).  He primarily spent his day watching television.  The plaintiff denied being depressed or anxious.  He followed simple commands (Tr. 466-67).  His mental status exam was unremarkable (Tr. 468).  The plaintiff walked on the heel and lateral side of his left foot.  His height was 66.5 inches, and he weighed 263 pounds.  He was comfortable when sitting (Tr. 467).  He independently moved from the supine to sitting to standing position and completely squatted and arose without assistance.  He displayed no arthritic changes of any joints (e.g., heat, erythema, tenderness or swelling).  He tended to keep his left foot everted or in lateral rotation, but he retained some motion of his ankle.  He touched his hands over and behind his head and behind his back.  He rotated his waist 45 degrees in each direction and bent forward 90 degrees (Tr. 468).  Dr. Siegel's impression was chronic thoracic and left ankle pain, hypertension (under good control with medication), and obesity (Tr. 468-69).

On January 27, 2011, the plaintiff entered into a Narcotics Agreement with Upstate Medical Rehabilitation (Tr. 506).  Kesha Pulley, R.M.A., reported that the plaintiff

14

was doing fine except for some constipation when he took over-the-counter medication (Tr. 506).

On January 13, 2011, Michael Perll, M.D., a physician consultant who worked with the State agency, reviewed the plaintiff's file (Tr. 473-79). Dr. Perll opined that plaintiff could perform wide range of sedentary work that involved occasionally using his left lower extremity for foot controls, no climbing of ladders, rope or scaffolds, and avoiding all exposure to hazards (Tr. 474-77). The plaintiff had no manipulative limitations (Tr. 476). Dr. Perll found the plaintiff's allegations generally consistent with the medical evidence of record (Tr. 473-79).

On February 23, 2011, the plaintiff followed up with April Smith, PA-C, of Upstate Medical Rehabilitation, complaining primarily of pain in his mid-back because he was "out fiddling with the horses," since one of the horses was ill. However, the plaintiff explained that he was unable to stand for a long period or walk very far when he cared for his horses. He denied any side effects from the medication that he took. Ms. Smith found that he was stable on his medication (Tr. 507).

On April 20, 2011, the plaintiff was seen at Upstate Medical Rehabilitation for medication refills. The plaintiff reported that his pain had decreased with medication, and the medication had not impaired his judgment, coordination, or ability to drive. The progress note does not indicate that the plaintiff was examined. The plaintiff was continued on Zestoretic, Motrin 800, Flexeril, Mobic, Ultram, Darvocet, ibuprofen 800, Voltaren gel, and Lortab 10 (Tr. 508).

On April 23, 2011, the plaintiff completed another Function Report-Adult (Tr. 202-09). The plaintiff took care of his animals (Tr. 203). He cooked, did household chores (e.g., cleaning, laundry and mowing), and shopped (Tr. 204-05). He went out every day (Tr. 205). He fished (Tr. 206). He continued to have no problems understanding, following instructions, and using his hands (Tr. 207).

15

On May 5, 2011, a Physical Residual Functional Capacity Assessment was completed by Richard Whitney, M.D., a non-examining doctor on contract to the administration.  He found the plaintiff capable of lifting and carrying 20 pounds occasionally and ten pounds frequently, standing/walking at least two hours in an eight hour workday, and sitting about six hours in an eight hour workday.  Dr. Whitney indicated that the plaintiff was limited to occasional use of his left lower extremity for foot controls due to ankle pain.  Dr. Whitney indicated that the plaintiff could never climb ladders, ropes, or scaffolds; could occasionally stoop, crouch, and climb ramps or stairs; and, could frequently balance, kneel, and crawl. The plaintiff was also limited to avoid all exposure to hazards (Tr. 509-16).

At the plaintiff's May 18, 2011, June 1, 2011, August 10, 2011, and November 2, 2011, medication checks at Upstate Medical Rehabilitation, he reported continued decrease in his pain with medication, and his medication had not impaired his judgment, coordination, or ability to drive (Tr. 517, 519-20, 524).  On May 31, 2011, and June 15, 2011, Dr. Shallcross refilled the plaintiff's medications, including  Lortab 10, Zanaflex, ibuprofen 800, Zestoretic, and Voltaren gel.  There was no indication in the progress notes that the plaintiff was examined. The plaintiff continued to rate his pain at an eight, even with medication (Tr. 517-19).

On August 10, 2011, and November 2, 2011, a physician's assistant in Dr. Shallcross' office evaluated the plaintiff and reviewed his medications.  The plaintiff rated his pain at seven out of ten.  The plaintiff's Lortab 10, imipramine, and Voltaren gel were refilled, and he was advised to continue his current medications (Tr. 520-21, 524-25).

On December 1, 2011, Dr. Shallcross examined the plaintiff (Tr. 522-23).  Dr. Shallcross observed that the plaintiff was overweight and exhibited a "quite non physiologic sort of gait."   Dr. Shallcross continued the plaintiff's medication.  Dr. Shallcross also suggested physical therapy so the plaintiff could stretch out his hip flexors and normalize his gait, but the plaintiff did not feel he could afford this (Tr. 522).  At the plaintiff's January

16

25, 2012, and February 24, 2012, medication checks, the plaintiff reported continued decrease in his pain with medication and his medication had not impaired his judgment, coordination, or ability to drive (Tr. 537, 539. 547).

On April 24, 2012, Ms. Smith evaluated the plaintiff. He reported increased back pain and continued left ankle pain. The plaintiff indicated that his TENS unit helped and needed a prescription for replacement pads. The plaintiff had tenderness to palpation in his midthoracic back. Medications, including Lortab 10, were refilled, and he was started on Neurontin (Tr. 548).

### Administrative Hearing Testimony

The plaintiff testified that he was awarded worker's compensation for the injuries he sustained in February 2008 (Tr. 72). He worked "on and off" since his alleged disability onset date but contended that he worked only "30 minutes/an hour" before he had to stop and sit down (Tr. 68). The plaintiff complained that his "worse" problem involved his back, which hurt "all the time" due to a "huge" knot in the middle of his back (Tr. 70-71). He had never undergone back surgery (Tr. 71). The plaintiff also complained that his left ankle hurt, and he needed to wear a brace or use a cane "most of the time" (Tr. 74). He acknowledged that he was told that his knee pain would be reduced if he lost weight (Tr. 78). The plaintiff was not receiving any treatment for his ankle (Tr. 74-75). The plaintiff reported that he "hardly ever" saw Dr. Shallcross and no longer saw Dr. Tollison (Tr. 70). The plaintiff denied having a mental impairment; he denied that he needed to take anti-depressant or anti-anxiety medication (Tr. 78, 84). He reported no significant problem concentrating (Tr. 67-84). The plaintiff disagreed with Dr. Shallcross's opinion that he had no limitation in sitting or using his upper extremities and could stand or walk in 45-minute intervals if he had a cane (Tr. 82-83).

### *Vocational Expert Testimony*

The vocational expert ("VE") testified that the plaintiff had past relevant work as a heavy equipment operator (Tr. 37).  The ALJ asked the VE if there would be any work for a person who was:

> limited to sedentary work, defined with a limited use on the lower extremities for push or pull, should not do that at all; can never use a ladder, rope or scaffold; can only occasionally use a ramp or stairs, stoop, crouch; and must avoid all exposure to hazards.

(Tr. 85).  The VE responded that this hypothetical would prohibit the plaintiff's past work but would allow for other sedentary, unskilled work existing in the national economy such as assembler jobs, inspecting jobs, and sorting jobs (Tr. 86).  The ALJ asked about a limitation to "sedentary work with essentially no limitation on sitting; can be on their feet for up to 45 minutes at a time; use of hands in a sitting position is not limited, but cannot really carry anything because  of need for a cane to assist in walking."  The VE responded that these limitations would still allow for the identified jobs (Tr. 87).  The ALJ's third hypothetical was, based on a combination of musculoskeletal impairments, if the impairments were severe enough to preclude work on a regular and sustained basis.  The ALJ explained that this meant the individual would "miss 3 or more workdays a month because of medical impairments."  The VE responded that this would preclude the identified jobs and all other work that might exist in the national economy (Tr. 87-88).

The plaintiff's attorney asked if there was a production or pace component to the jobs identified by the VE to the ALJ's first two hypotheticals.   The VE responded affirmatively.  The attorney asked about the impact of scoring below the second percentile in the Penn Bimanual Dexterity Work Sample.  The VE indicated that he was familiar with the testing and testified that scoring in the second percentile would "not allow him to perform production activities" (Tr. 88).  The plaintiff's attorney also asked about a limitation

of only being able to "sit for 30 minutes to 1 hour as opposed to no limit with sitting, would that affect any of those jobs, assuming they would have to take a break rather than change to a standing component" (Tr. 89). The VE responded, "Certainly, I think if he would have to take a break every 30 minutes to an hour, it would be too frequent. It would be considered excessive breaks. It would not allow him to work" (Tr. 89-90).

The ALJ asked the VE whether there were jobs available for a hypothetical individual who had the plaintiff's vocational profile and residual functional capacity ("RFC") (Tr. 31-32, 86-87). The VE advised that the individual could perform a significant number of unskilled sedentary occupations in the national economy within such occupations as lamp shade assembler (288,000 jobs), nut sorter (322,000 jobs), and inspector (362,000 jobs) (Tr. 86-87). The VE explained that if the individual scored below the second percentile on the Penn Bimanual Dexterity Worksample, he could not perform production activities because he would be "too slow" (Tr. 88-89).

### Appeals Council Evidence

On February 28, 2008, Dr. Freidinger indicated that the plaintiff required a transarticular pin due to persistent left ankle instability. The plaintiff had mild swelling and mild tenderness to palpation in the medial aspect of his left ankle. He was converted to a well-padded short cast and given strict instructions for non-weight bearing. Dr. Freidinger prescribed Vicodin (Tr. 549).

On March 28, 2008, Dr. Freidinger evaluated the plaintiff, who reported compliance with non-weight bearing and indicated that his back pain was actually more problematic. X-rays showed a healing fracture dislocation. The plaintiff was converted to a short leg cast, and his ankle pin was removed. He was given crutches and instructions against weight bearing (Tr. 560).

On April 25, 2008, Dr. Freidinger reevaluated the plaintiff, who reported that he had occasional soreness at night, but was otherwise improving. On examination, the

plaintiff had significantly reduced range of motion in his left ankle and was weak. X-rays showed his fracture was consolidating nicely. The plaintiff was converted to a CAM walker and instructed on initiating weight bearing as tolerated. Therapy was ordered for gait training exercises and range of motion and strengthening exercises(Tr. 558-59).

On July 8, 2008, the plaintiff was evaluated at Doctors Care for back and ankle pain. It was noted that he was being scheduled for an orthopedic evaluation through workers' compensation. An out of work slip was provided (Tr. 563-65).

The plaintiff participated in physical therapy from November 2008 to February 2009 (Tr. 570-80).

On November 29, 2011, Christian Williams, M.D., evaluated the plaintiff for multiple problems including pain management and arthritis. Dr. Williams noted the focus of the visit was on the plaintiff's high blood pressure. Dr. Williams diagnosed benign essential hypertension and prescribed Lisinopril. He also indicated that they would obtain copies of the plaintiff's pain management medication (Tr. 592-96).

On December 1, 2011, Dr. Williams evaluated the plaintiff and noted that the plaintiff'ss cholesterol and triglycerides were elevated. He recommended a diet change attempt before prescribing medication (Tr. 583-87).

On April 16, 2012, Dr. Williams evaluated the plaintiff for chronic back pain and long-term opiate medication for pain control. Dr. Williams diagnosed generalized osteoarthritis of multiple sites (Tr. 581-83).

The plaintiff saw Dr. Shallcross for medication checks on May 22, 2012, and June 21, 2012.  The plaintiff continued reporting that his pain had decreased since he began treatment, and his medication had not impaired his judgment, coordination, or ability to drive.  Dr. Shallcross did not examine the plaintiff at either visit (Tr. 600-03).

On November 15, 2012, Dr. Shallcross wrote a note regarding the plaintiff's treatment history.  Dr. Shallcross reported that he had treated the plaintiff for chronic pain

complaints between December 2008 and July 2012 related to multiple injuries including a history of an ankle fracture, a compression fracture of his thoracic spine, and rib fractures. The plaintiff had undergone two surgeries to repair his left ankle. His gait was antalgic and not physiologic, and he complained of stiffness in his back. Based on his April 2009 exam, Dr. Shallcross felt that the plaintiff could be on his feet for up to 45 minutes but was restricted in carrying because he needed to use a cane when he walked. The plaintiff's weight (275 pounds) could exacerbate his back pain. Dr. Shallcross believed that the plaintiff "could not do more than a sedentary job," but, "even at a sedentary job he would suffer interruptions to his concentration sufficient to frequently interrupt tasks throughout the workday due to his back and foot pain. Dr. Shallcross also believed that the plaintiff would need to rest away from the workstation for more than one-hour out of the workday due his back and leg pain. Dr. Shallcross concluded that the plaintiff had these limitations throughout his period of treatment (Tr. 604).

### ANALYSIS

The plaintiff was 41 years old on the alleged disability onset date and 46 years old when the ALJ issued his decision (Tr. 67). He graduated from high school and worked as a heavy equipment operator and welder (Tr. 67, 85-86, 162-63, 182). The plaintiff argues that (1) new evidence submitted to the Appeals Council warrants remand, and (2) the ALJ failed to include all of his credible limitations in the RFC assessment.

### *Appeals Council*

The plaintiff submitted evidence to the Appeals Council. The Appeals Council denied review, finding that the evidence did not provide a basis for changing the ALJ's decision (Tr. 1-4). Dr. Shallcross' November 15, 2012, opinion was part of the evidence submitted to the Appeals Council and was incorporated into the record (Tr. 1, 5, 8; *see* Tr. 604). The plaintiff argues that the case should be remanded to the ALJ for consideration of this evidence (pl. brief at 18-21).

21

As set forth more fully above, on November 15, 2012, Dr. Shallcross stated that, based on his April 2009 exam, the plaintiff could be on his feet for up to 45 minutes but was restricted in carrying because he needed to use a cane when he walked. The plaintiff's weight (275 pounds) could exacerbate his back pain. Dr. Shallcross stated that the plaintiff "could not do more than a sedentary job," but, "even at a sedentary job he would suffer interruptions to his concentration sufficient to frequently interrupt tasks throughout the workday due to his back and foot pain." Dr. Shallcross also stated that the plaintiff would need to rest away from the workstation for more than one-hour out of the workday due his back and leg pain (Tr. 604).

The plaintiff argues that Dr. Shallcross' November 2012 opinion might have affected the ALJ's finding and, therefore, remand is warranted (pl. brief at 18) . The plaintiff relies on *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), arguing that Dr. Shallcross' opinion is "critical" missing evidence that the factfinder needs to consider because it is the "sole" record evidence of the opinion of a treating physician (pl. brief at 18-21).

The plaintiff argues that the facts of this case "match precisely the facts of *Meyer*" (pl. brief at 20). The ALJ in *Meyer* issued a decision denying benefits and noted that Meyer failed to provide an opinion from his treating physician. 662 F.3d at 702. When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician detailing the injuries (from a fall) and noting significant restrictions on Meyer's activity. The Appeals Council summarily denied review but made the letter part of the administrative record. The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician and thus the report should be accorded only minimal weight, and the district court adopted the Report and Recommendation. *Id.* at 704. The Court of Appeals, however, determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the

22

report constituted new and material evidence. *Id*. at 705. The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had considered. *Id*. at 707. The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence. *Id*.

The undersigned agrees with the Commissioner (def. brief at 16-19) that the additional evidence submitted to the Appeal Council does not undermine the substantial evidence supporting the ALJ's decision. Dr. Shallcross' November 2012 opinion is not the only opinion of a treating physician in the record; already contained in the record before the ALJ was an opinion from Dr. Shallcross (*see* Tr. 330). On April 30, 2009, Dr. Shallcross examined the plaintiff and noted that the plaintiff could "sit pretty much unlimited," could use his hands in a seated position, could stand/walk in 45-minute intervals, needed to use a cane almost all of the time to avoid falls, and could not really carry much of anything when he used a cane (Tr. 330). The ALJ gave Dr. Shallcross' opinion "controlling" weight, finding the opinion was consistent with the evidence of record as a whole, which included Dr. Shallcross' own treatment notes, the treatment notes of other physicians, and the results of clinical tests (Tr. 34).

The plaintiff contends that Dr. Shallcross' April 2009 "notations" in a "progress note" was not "an independent opinion" (pl. brief at 20). However, the plaintiff does not explain why Dr. Shallcross' statement as to the plaintiff's physical limitations was not an "independent opinion." As noted by the Commissioner, Dr. Shallcross was the plaintiff's treating physician, and Dr. Shallcross expressed his opinion in the plaintiff's progress notes, which suggests that it was an accurate summarization of Dr. Shallcross' assessment of the plaintiff's condition at that time (Tr. 330). Further, Dr. Shallcross considered his April 2009 statements trustworthy enough that he repeated essentially the same limitations in the November 2012 note that is now at issue (*see* Tr. 330, 604). While the plaintiff contends

that his condition had deteriorated since April 2009, Dr. Shallcross wrote in November 2012 that the plaintiff could still "not do more than a sedentary job" (*see* Tr. 604). Dr. Shallcross repeated that, based on his April 2009 exam, the plaintiff could be on his feet for 45 minutes at most and was restricted in carrying when he walked because he needed to use a cane (Tr. 604). Therefore, to this extent, Dr. Shallcross' November 2012 opinion was not new evidence that provided information that would change the ALJ's decision as these same findings were given controlling weight by the ALJ.

Dr. Shallcross also wrote in November 2012 that he believed the plaintiff's back and foot pain would cause interruptions to his concentration sufficiently to frequently interrupt him from doing tasks throughout the workday and that the plaintiff needed to rest away from the workstation for more than an hour in the workday (Tr. 604). However, Dr. Shallcross did not cite to any clinical or laboratory diagnostic findings that supported these restrictions. Dr. Shallcross only cited to the plaintiff's complaints of back and foot pain as the basis for these restrictions (Tr. 604).  Under Fourth Circuit law, a conclusory opinion based upon an individual's subjective complaints of pain is not entitled to particular deference. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

Dr. Shallcross' treatment notes do not show that the plaintiff had any significant concentration deficits due to pain (*see* Tr. 326-35, 517-18, 522-25, 537-40, 600-03). Furthermore, as argued by the Commissioner, the other medical and non-medical evidence also did not suggest that the plaintiff had any significant deficit in his concentration.  The plaintiff's Upstate Medical Rehabilitation records repeatedly reported that the plaintiff's medication had not impaired his judgment or ability to drive (Tr. 508, 517, 519-20, 524, 537, 539, 547, 600, 602).  The plaintiff denied any mental health issues when he saw Dr. Brabham, and his general comprehension and abstract thinking were intact on examination (Tr. 323). Dr. Brabham concluded that the plaintiff could perform entry-level work, which is consistent with the ALJ's finding that the plaintiff could do unskilled work (Tr.

24

31-32; *see* Tr. 324). In his Function Report-Adult on September 5, 2010, the plaintiff acknowledged that his condition had not affected his concentration, attention, memory, understanding, following instructions, and completing tasks (Tr. 179). In his Function Report-Adult on April 23, 2011, the plaintiff stated that his concentration was affected by his pain ("when hurting I forget what I was doing or thinking"), but his memory, understanding, and following instructions were not affected (Tr. 207). At the hearing, the plaintiff did not report any significant problems with concentration or attention (Tr. 67-84), and he denied having a mental impairment (Tr. 78).

The record also does not support Dr. Shallcross' statement that the plaintiff would need to rest away from his workstation for greater than an hour (Tr. 604). Dr. Shallcross' treatment notes do not show why the plaintiff would have a medically determinable need to rest away from his workstation. According to the evidence that the plaintiff submitted to the ALJ and the Appeals Council, prior to giving his November 2012 opinion, Dr. Shallcross had not examined the plaintiff since December 15, 2011; before then, Dr. Shallcross had last examined the plaintiff in May 2010 (Tr. 326, 507-08, 517-25, 537-40, 547-48, 600-03). Furthermore, the ALJ observed that, despite his complaint of pain, the plaintiff engaged in a wide range of daily activities (Tr. 33). The ALJ noted that the plaintiff straightened up his bedroom, did the laundry, helped cook/prepare meals, drove, grocery shopped, cut grass using a riding lawnmower, and fished in a local pond (Tr. 33; *see* Tr. 173, 176-77, 204-06, 531). At his May 2010 visit with Dr. Shallcross, the plaintiff reported that he had was doing a "little bit" of welding (Tr. 326). At the plaintiff's later visit with Ms. Smith in February 2011, the plaintiff stated that he had been "out fiddling with the horses" (Tr. 507). As the ALJ observed, the record showed that while the plaintiff complained of pain, it was helped by this treatment regimen (such as his use of medication and an ankle brace) (Tr. 23-24, 26-27, 33; *see* Tr. 171, 315, 326-28, 506-08, 517, 519-20, 524, 537, 539, 545, 547).

25

Based upon the foregoing, reviewing the record as a whole, including the new evidence, the undersigned finds that remand for consideration of Dr. Shallcross' November 2012 opinion is not warranted as it does not provide a reasonable basis for changing the ALJ's decision, and substantial evidence supports the ALJ's findings.

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ did not adequately assess his RFC (pl. brief 21-23). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

26

The plaintiff argues that the ALJ erred in failing to adopt certain findings of Dr. Stewart, a rehabilitation counselor and vocational evaluator who examined the plaintiff at the request of his attorney for workers' compensation purposes (pl. brief at 22-23). Specifically, Dr. Stewart stated that the results of the Penn Bi-Manual Dexterity Worksample were suggestive of a slow work speed and pace that indicated the plaintiff could not perform jobs that required a fast pace/production rate work speed (Tr. 532). The plaintiff contends the ALJ failed to adequately consider this objective testing (pl. brief at 24). Dr. Stewart ultimately indicated that the plaintiff's chronic pain and resulting increased pain with activity and psychological symptoms prevented him from maintaining "adequate concentration, pace and persistence, meeting normal/expected levels of productivity/work output and maintaining a sufficient energy level which are all necessary to sustaining employment, particularly at sedentary to light levels of work" (Tr. 526-36).

The ALJ stated that he considered Dr. Stewart's "non-medical opinion" and noted that the evaluation was done in connection with the plaintiff's workers compensation claim (Tr. 36). The ALJ noted that Dr. Stewart's opinion that the plaintiff had a mental impairment was inconsistent with the opinions of all treating and examining physicians and psychologists, as well as the plaintiff's own statements. He also noted that Dr. Stewart opined that the plaintiff could not perform even sedentary work, which was inconsistent with the opinions of Drs. Shallcross and Tollison, whose opinions Dr. Stewart reviewed and cited. Accordingly, the ALJ gave no weight to Dr. Stewart's opinion (Tr. 36).

Substantial evidence supports the ALJ's decision to give Dr. Stewart's opinion no weight. The regulations define "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). Health care providers who are not "acceptable medical sources" but instead "other sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths,

chiropractors, audiologists, and therapists.  SSR 06-03p, 2006 WL 2329939, at *2.  "Other sources" also include educational personnel, family members, public and private social welfare agency personnel, and rehabilitation counselors, like Dr. Stewart. *Id. See* 20 C.F.R. §§ 404.1513, 416.913 (stating "[w]e need evidence from acceptable medical sources to establish whether you have a medically determinable impairment" and noting that evidence from "other medical sources" may be considered to show the severity of an impairment and how it affects the individual's ability to function). The weight to be given to evidence from other sources "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors." SSR 06-03p, 2006 WL 2329939, at *4.  "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight." *Id.* at *2.  The ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

As discussed above, Dr. Shallcross opined that the plaintiff could use his hands in a seated position (Tr. 330). Furthermore, the plaintiff informed Dr. Brabham, a psychologist who conducted a psychological and vocational evaluation of the plaintiff for workers' compensation purposes, that he agreed with Dr. Shallcross' opinion that he had no restriction in sitting and using his hands (Tr. 324). The MRI of the plaintiff's thoracic spine revealed that he had minimal degenerative changes of the mid and lower thoracic spine, and it was negative for disc herniation or other significant finding (Tr. 335).  The plaintiff denied having any pain that radiated into his arms (Tr. 467).  Drs. Perll and Whitney opined that the plaintiff had no manipulative limitations (Tr. 476, 512).  Finally, in his

function reports, the plaintiff reported that his condition had not affected his ability to use his hands (Tr. 179, 207).

While the plaintiff contends that the ALJ never addressed the objective Penn Bi-Manual Dexterity Worksample results, he neglects to acknowledge that the ALJ accorded Dr. Shallcross' contradicting opinion "controlling" weight (Tr. 34, 330; pl. brief at 22). The court cannot re-weigh conflicting evidence or substitute its judgment for the ALJ. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  The ALJ reasonably decided to provide more weight to Dr. Shallcross' opinion when compared with Dr. Stewart's opinion, and the evidence substantially supports the ALJ's decision.  Accordingly, this allegation of error lacks merit.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

February 24,  2015
Greenville, South Carolina